UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISAREL FLATFORD *et al.*,

      Plaintiffs,

v.

INTERNATIONAL UNION UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, LOCAL
663, *et al.*,

      Defendants.

Case No. 13-cv-14243
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF ##21-22)

Plaintiffs are former employees of Guide Corporation ("Guide"), a supplier of auto parts to Defendant General Motors, LLC ("General Motors"). In 2007, Guide closed the Indiana factory at which Plaintiffs worked. In connection with the factory closure, Defendant International Union United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") entered into a memorandum of understanding with Guide and General Motors. (*See* the "MOU," ECF #21-4.) In the MOU, General Motors granted Plaintiffs and other Guide employees certain future hiring preferences and wage guarantees.

In this action, Plaintiffs allege that General Motors breached the MOU by failing to honor the promised hiring preferences and wage guarantees. Plaintiffs further allege that the UAW and UAW Local 663 (collectively, the "Union") breached their duty of fair representation and committed common-law fraud. Defendants have now moved for summary judgment. (*See* General Motors' Motion, ECF #21 and the Union's Motion, ECF #22.) For the reasons explained below, the Court **GRANTS** Defendants' Motions.

## RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs Isarel Flatford ("Flatford") *et al.* are 36 Guide employees, former employees, or retirees. (*See* the "Amended Complaint," ECF #5 at ¶5.) Plaintiffs worked at Guide's factory in Anderson, Indiana (the "Anderson Factory"). (*See id.*) At all relevant times, Plaintiffs were members of the Union. (*See id.*) The Union, Guide, and General Motors were parties to various collective-bargaining agreements. (*See, e.g.,* ECF #21-3 at 2, Pg. ID 160 (referencing collective-bargaining agreement).)

Guide closed the Anderson Factory on or about January 12, 2007. (*See* Am. Compl. at ¶5.) Shortly after the closing, on January 31, 2007, the Union and General Motors sponsored an informational meeting for Guide employees at which the parties discussed how the employees would be treated going forward (the "January 2007 Meeting"). (*See id.* at ¶8.) Plaintiffs allege that during the January

2

2007 Meeting the Union and General Motors promised that the displaced Guide employees would receive certain hiring preferences at General Motors and certain wage guarantees if they became employed by General Motors.  (*See id.* at ¶9.) Plaintiffs further allege that a representative of the Union told them that the Union and General Motors were working on a plant closure agreement (i.e., the MOU) that would be subject to a vote by union members, that the agreement was not yet finalized, and that the agreement would include the hiring preferences and wage guarantees discussed at the January 2007 Meeting.  (*See id.* at ¶10.)  Plaintiffs allege that, based on these representations, the Guide employees voted to approve the MOU before it was finalized.  (*See id.*)

The Union, Guide, and General Motors ultimately completed and executed the MOU.  (*See* the MOU.)  The MOU established the "Special Attrition Program," which provided employees of the Anderson Factory with several severance and/or alternative employment options.  (*See id.* at 2-4, Pg. ID 169-71.) Plaintiffs each chose to participate in "Option 5" of the Special Attrition Program. (*See* Am. Compl. at ¶22; *see also* General Motors' Mot. at 5, Pg. ID 120.)  Option 5 allowed Plaintiffs to be considered for employment with General Motors. Specifically, Option 5 permitted Plaintiffs to:

> [R]emain on the seniority rolls for Guide Corporation and be governed by the current agreements between Guide Corporation and the UAW, make application for General Motors new hire consideration consistent with

3

the process and administrative rules developed by the parties including relocation allowance, if applicable, in the amount of $12,500.

Upon being hired by General Motors, the employee will lose all seniority rights at Guide and will sever all ties with Guide except for treatment under the Guide Hourly-Rate Employees Pension Plan ("Guide HRP") that will be described subsequently by the parties. These employees will not be eligible for any payments contemplated elsewhere within this Option or any other Option of this Special Attrition Program….

(MOU at 3, Pg. ID 170.)  A letter from Dean Munger, Executive Director of Labor Relations for General Motors, to the Union later clarified that employees hired by General Motors pursuant to Option 5 would receive a "wage rate … based upon their current progression…."  (*See* the "Munger Letter," ECF #21-5 at 3, Pg. ID 174.)  The parties do not dispute, for purposes of these Motions, that Option 5 both created a hiring preference for Plaintiffs at General Motors (the "Hiring Preference") and  guaranteed Plaintiffs certain wages if they were ultimately hired by General Motors (the "Wage Guarantee").

In late 2007 and/or early 2008, Plaintiffs came to believe that General Motors breached the Hiring Preference by hiring certain temporary employees into permanent positions prior to hiring Plaintiffs (the "Hiring Breach").  (*See* Am. Compl. at ¶13.)  At this same time, Plaintiffs filed grievances with the Union regarding the Hiring Breach.  (*See* "Grievance #11810" and "Grievance #11851," collectively, the "Hiring Grievances," ECF #21-8.)   The Hiring Grievances

4

specifically alleged that General Motors "failed to offer job opportunities to UAW Guide Option 5 Participants from the Anderson [Factory] … while hiring permanent employees." (*See id.* at 2, Pg. ID 221.) UAW Associate General Counsel William Karges ("Karges") reviewed the Hiring Grievances and determined that they lacked merit because, in Karges' opinion, Option 5 did not guarantee Plaintiffs employment with General Motors, and there was no evidence that General Motors breached the MOU or any other agreement. (*See* the "Grievance Appeal," ECF #21-6 at 23-24, Pg. ID 198-99.) Accordingly, the Union withdrew the Hiring Grievances – i.e., decided not to pursue the Hiring Grievances with General Motors on Plaintiffs' behalf – on April 7, 2009. (*See id.*)

Plaintiffs then appealed Karges' decision to withdraw the Hiring Grievances to the UAW International Executive Board (the "IEB"). (*See id.* at 33, Pg. ID 208.) On May 20, 2010, the Union notified Plaintiffs that the IEB denied their appeal. (*See* the "IEB Denial Notification," *id.* at 41, Pg. ID 216.) Plaintiffs have acknowledged that they received the IEB Denial Notification at about that time. (*See* ECF #21-9 at 2, 8; Pg. ID 224, 230.)

In early 2012, five of the Plaintiffs who had been hired by General Motors following the closure of the Anderson Plant came to believe that General Motors breached the Wage Guarantee by failing to pay them the promised wage. These five Plaintiffs filed a grievance with the Union in January 2012. (*See* the "Wage

5

Grievance," ECF #21-12.)   Following a hearing, on October 25, 2012, UAW President Bob King denied the Wage Grievance on the ground that the Wage Guarantee had been superseded by a subsequent agreement between the UAW and General Motors.   (*See* the "King Letter," ECF #21-17.)   King informed the Plaintiffs who filed the Wage Grievance that "pursuant to Article 33, Section 2B of the International [UAW] Constitution, your appeal is respectfully denied *and this matter is closed*."   (*See id.;* emphasis added.)   Plaintiffs have acknowledged that they received the King Letter on or about October 25, 2012.  (*See* ECF #21-9 at 2, 9; Pg. ID 224, 231.)

On October 4, 2013, Plaintiffs filed this "hybrid" suit pursuant to section 301 of the Labor and Management Relations Act ("LMRA"), 29 U.S.C. § 185 ("Section 301"), and section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a) ("Section 9(a)").   (*See* Am. Compl.)   Plaintiffs assert three claims in their Amended Complaint.   First, Plaintiffs allege that General Motors breached the MOU and other agreements amongst the parties by failing to comply with the Hiring Preference and Wage Guarantee.   (*See id.* at ¶¶32-34.)   Second, Plaintiffs allege that the Union violated its duty of fair representation by failing to pursue the Hiring Grievances and Wage Grievance with General Motors and by making material misrepresentations regarding the Hiring Preference and Wage Guarantee at the January 2007 Meeting.   (*See id.* at ¶¶33-37.)   Finally, Plaintiffs allege that

6

the Union committed statutory and common-law fraud under Indiana law by misrepresenting the hiring and wage protections that would be incorporated into the MOU at the January 2007 Meeting.  (*See id.* at ¶¶35-40.)

On June 24, 2014, the Court conducted a Scheduling Conference with the parties.   At the conference, the parties agreed, and the Court ordered, that the litigation would be conducted in phases.  (*See* ECF #18.)  During the first phase, each party would conduct discovery solely concerning whether Plaintiffs exhausted their intra-union remedies and whether Plaintiffs filed this action within the applicable statutes of limitations, and the Court would hear and decide a dispositive motion based on these issues.  (*See id*.)  The first phase of discovery has been completed, and Defendants have now moved for summary judgment. They argue that Plaintiffs' federal causes of action are barred by the applicable statutes of limitations and that Plaintiffs' state law causes of action are completely preempted by federal law.  (*See* General Motors' Motion and the Union's Motion.) The Court heard oral argument on the Motions on April 6, 2015.

## <u>GOVERNING LEGAL STANDARD</u>

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record,

"the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

**1. Defendants Are Entitled to Summary Judgment on Plaintiffs' Section 301 and Section 9(a) Claims Because They Are Untimely**

Where, as here, a union member files a Section 301 claim against his employer and a Section 9(a) claim against his union in the same action, the action is known as a hybrid suit. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983). "'A hybrid section 301 action involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union.' The two claims are 'inextricably interdependent.' Unless a plaintiff 'demonstrates both violations, he cannot succeed against either party.'" *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (citations omitted).

8

A six-month statute of limitations applies to hybrid Section 301/fair representation claims. *See DelCostello*, 462 U.S. at 169. In general, a hybrid claim accrues, and the six-month statute of limitations begins to run, "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000 (6th Cir. 1994) (citations and quotations omitted). "The timeliness of the suit must be measured from the date on which the employee knew or should have known of the union's final action or should have known of the employer's final action, whichever occurs later." *Robinson v. Cent. Brass Mfg. Co.*, 987 F.2d 1235, 1239 (6th Cir. 1993) (internal citation omitted). When assessing the timeliness of a hybrid claim, the court "must establish a single accrual date for [the hybrid] claim and then ascertain whether the plaintiffs filed suit within six months of that date." *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 803 (6th Cir. 1990).

## A. Plaintiffs' Hiring Claim Accrued on or About May 20, 2010, and is Therefore Time-Barred

Plaintiffs' claim that General Motors failed to comply with the Hiring Preference and that the Union refused to pursue the Hiring Grievance (the "Hiring Claim") accrued no later than May 20, 2010. That is the date on which the IEB notified Plaintiffs that it denied Plaintiffs' appeal of the Union's decision to withdraw the Hiring Grievances. The IEB's denial of the appeal was the Union's

final action on the issue and occurred after General Motors' alleged breach of the Hiring Preference.   Thus, the IEB's denial of the appeal was the final action by either the Union or General Motors, and the Hiring Claim accrued when Plaintiffs received the IEB Denial Notification on or about May 20, 2010. *See Robinson*, 987 F.2d at 1239.  Because Plaintiffs did not initiate this suit within six months of May 20, 2010, the Hiring Claim is time-barred.

Plaintiffs acknowledge that the Hiring Claim is barred to the extent that it challenges the Union's decision to withdraw the Hiring Grievances (*see* Response Brief, ECF #24 at 4, Pg. ID 316), but Plaintiffs insist that they may nonetheless proceed with the claim.   More specifically, Plaintiffs contend that the Hiring Grievances were not the only grievances filed regarding the Hiring Breach, and they claim that the Union has not acted on the other grievances that challenged General Motors' failure to hire them.  (See *id.* at 17, Pg. ID 329.)  Plaintiffs argue that the Union has not ruled on these other grievances challenging the Hiring Breach and that the statute of limitations for a claim arising out of those grievances and challenging the Hiring Breach has therefore not even commenced, much less expired.  (*See id.*)  Plaintiffs argue that the Hiring Claim is based upon the challenges to the Hiring Breach raised in the other, still-pending grievances and is thus timely.  The Court disagrees.

10

Plaintiffs have not provided sufficient evidence concerning the content of the other grievances.  Plaintiffs' sole evidence about the other grievances is an undated and unsigned letter from Rich LeTourneau ("LeTourneau"), Chairman of UAW Local 2209, to Joe Ashton, Vice President and Director of the UAW's General Motors Department, "on behalf of … members at UAW Local 2209 who … started at Guide Anderson, Indiana."  (*See* the "LeTourneau Letter," ECF #21-15.)  The LeTourneau Letter is lengthy and confusing.  It references many issues related to the closing of the Anderson Factory.  Among other things, the LeTourneau Letter mentions the MOU, the Munger Letter, and "the process to allow Guide employees to be hired at General Motors."  (*See id.* at 3, Pg. ID 247.)  The LeTourneau Letter also notes that Union members filed several grievances relating to the closure of the Anderson Factory: the Hiring Grievances and four others that LeTourneau referenced by number (the "Additional Grievances").  (*See id.* at 3-4, Pg. ID 247-48.)  But the LeTourneau Letter provides no specific details concerning the content of the Additional Grievances.  There is thus very little evidence that the Additional Grievances actually addressed and/or have any bearing on the Hiring Breach that Plaintiffs wish to challenge in this action.

Moreover, the Hiring Claim would not be timely even if the Additional Grievances did address the Hiring Breach, as Plaintiffs claim they did.  Simply put, when the IEB denied the Plaintiffs' appeal of the decision to withdraw the Hiring

11

Grievances on May 20, 2010, it unequivocally indicated that the Union would *not* be challenging the Hiring Breach.   Thus, even if the Additional Grievances addressed the Hiring Breach and even if they remained pending after the IEB issued its decision on the Hiring Grievances appeal, Plaintiffs had to know on May 20, 2010, that (1) the Union would not challenge the Hiring Breach, (2) the Union would not resolve the Additional Grievances in their favor, and (3) they would have to file a civil action if they wished to challenge the Union's refusal to contest the Hiring Breach.   Thus, even if the Additional Grievances addressed the Hiring Breach, that would not change the fact that any claim based upon that breach – as the Hiring Claim is – accrued on May 20, 2010, when the IEB denied the appeal of the Hiring Grievances.[1]

At oral argument, Plaintiffs sought leave to conduct additional discovery as to the Additional Grievances and/or to amend their Complaint to include allegations relating to the Additional Grievances.   But Plaintiffs have already had an opportunity to conduct discovery concerning Defendants' statute of limitations defenses and the facts underlying those defenses – indeed, that was the exclusive focus of the initial discovery permitted by the Court – and they have not submitted

---

[1]   If, on the other hand, the Additional Grievances did not address the Hiring Breach, then the Additional Grievances are inapposite to Plaintiffs' current Hiring Claim.   Simply put, no matter the content of the Additional Grievances, the existence of those grievances does not save Plaintiffs' cause of action from Defendants' statute of limitations defense.

an affidavit under Fed. R. Civ. P. 56(d) explaining why additional evidence related to the Additional Grievances was not available to them prior to the filing of Defendants' Motions. Moreover, when the Court specifically asked Plaintiffs' counsel at oral argument how Plaintiffs would amend their Complaint to state a timely claim based on the Additional Grievances, he was unable to identify a single proposed amendment. The Additional Grievances do not save Plaintiffs' time-barred cause of action with respect to the Hiring Claim.

## B. Plaintiffs' Wage Claim Accrued On or About February 28, 2013, and is Therefore Time-Barred

Plaintiffs' claim that General Motors failed to comply with the Wage Guarantee and that the Union refused to pursue the Wage Grievance (the "Wage Claim") is also barred by the six-month statute of limitations. The statute of limitations as to the Wage Claim began to run on October 25, 2012, when King informed Plaintiffs that the Wage Grievance was denied and that the matter related to the Wage Breach was "closed." (*See* the King Letter.) Because Plaintiffs did not initiate this suit within six months of October 25, 2012, their cause of action as to the Wage Claim is time-barred.

Plaintiffs insist that the King Letter did not trigger the statute of limitations because King did not follow the appeals process outlined in the UAW Constitution. (*See* Resp. Br. at 17-18, Pg. ID 330-31.) They insist that King wrongfully denied them of an additional opportunity to appeal and that his letter therefore did not

13

represent a final decision by the Union that commenced the statute of limitations. (*See id.*)  But whether King complied with the UAW Constitution is beside the point.  The question with respect to the commencement of the limitations period is not whether King followed the Union's rules.  Instead, the relevant question is: when did the Union clearly communicate to the Plaintiffs that the it had made a final decision not pursue the Wage Grievance on their behalf?  It is at that point that Plaintiffs would have been on notice of the conduct by the Union underlying the Wage Claim and at that point that the limitations period began to run.

The King Letter unambiguously stated that the Union had made a final decision not to pursue the Wage Claim.  Indeed, King cited Article 33, Section 2(b) of the International UAW Constitution – which provides, in relevant part that there "shall be no further appeal"[2] – and emphasized that the matter was "closed."

---

[2]  Section 2(b) provides:

> In the types of cases listed below, the appeal shall be limited as specified:
>
> …
>
> For any interpretation of a collective bargaining agreement by a National Department or Regional Director, where the interpretation is so obviously correct that no purpose will be served by an appeal, and were it is consistent with other provisions of this Constitution and International Union policy, *the appeal shall be directly to the International President. There shall be no further appeal from that decision.*

14

Reading the King Letter as a whole, Plaintiffs should have known that the Union did not intend to pursue the Wage Claim and that they would not be permitted to appeal King's determination.  Thus, the statute of limitations began to run when Plaintiffs received the King Letter on or about October 25, 2012.

Plaintiffs counter with two subsequent communications from the Union that, in their view, establish that the statute of limitations did not commence until a later date.  First, Plaintiffs cite a February 28, 2013, letter to Flatford from Barbara A. Klein ("Klein"), Executive Director of the UAW's Public Review Board (the "PRB").  (*See* the "Klein Letter," ECF #21-22.)  Klein wrote to Flatford after he attempted to appeal King's determination not to pursue the Wage Grievance to the PRB.  Klein again explained to Flatford that the Union would not be pursuing the Wage Grievance:

> I am responding to your letter of February 7, 2013, regarding your attempt to submit an appeal to the [PRB]…. On October 25, 2012, President Bob King determined that no contract violation had occurred. President King indicated Article 33, § 2(b) applied to this ruling so that the matter was closed.

---

(ECF #21-2 at 4-5, Pg. ID 148-49.)  Plaintiffs contend that it was not clear that King was referring to this language when he cited to Article 33, Section 2(b) in his letter.  Plaintiffs note that Article 33, Section 2(b) contains other language and other provisions.  However, when the King Letter and Article 33, Section 2(b) are read in context and in their entirety, it is clear (and should have been clear to Plaintiffs) that King was referring to the language quoted above.  Indeed, the other provisions of Section 2(b) do not even purport to apply where, as here, the International President rendered a decision on an appeal relating to the interpretation of an agreement between the Union and an employer.

15

>President's King staff has no record of an appeal from
>you in response to the ruling dated October 25, 2012.
>Your attempt to appeal the matter at this time appears to
>be untimely…. [A]ppeals to the PRB must be filed
>within thirty (30) days.
>
>In any event, there is generally no appeal from a ruling of
>the International President issued pursuant to Article 33,
>§ 2(b)….
>
>If Article 33, § 2(b) applies to your appeal, President
>King's decision is final and no further proceedings are
>authorized by the Constitution.

(*Id.*)

Construed in the light most favorable to Plaintiffs, the Klein Letter arguably

creates confusion as to whether Plaintiffs had a right to appeal King's

determination to the PRB. Indeed, the Klein Letter initially purported to reject

Flatford's attempted appeal because the appeal was untimely, not because Flatford

lacked the right to appeal. But even if the Klein Letter created some confusion as

to the finality of King's decision, the Klein Letter unequivocally stated that the

PRB would *not* consider, much less grant relief on, Flatford's attempted appeal.

Thus, even if King's decision on October 25, 2012, was not final, the Klein Letter

clearly informed Plaintiffs that the Union intended not to pursue the Wage Claim.[3]

Thus, the statute of limitations as to the Wage Claim would have started to run – at

---

[3] Flatford does not deny receiving the Klein Letter. (*See e.g.,* Resp. Br. at 18, Pg.
ID 330 (acknowledging receipt of Klein Letter).) If Flatford did not receive the
Klein Letter, Plaintiffs' argument would be even weaker because Klein's arguably
ambiguous statements would not have created confusion about the unambiguous
King Letter.

16

the very latest – when Flatford received the Klein Letter on or about February 28, 2013. But Plaintiffs did not initiate this suit within six months of that date, so their cause of action as to the Wage Claim would still time-barred, even under this theory.

Second, Plaintiffs point to a letter from Eunice Stokes-Wilson ("Stokes-Wilson"), King's Administrative Assistant, to Flatford dated April 4, 2013. This letter responded to yet another inquiry by Flatford following King's letter from October 2012. Stokes-Wilson reiterated that the Union had previously decided not to pursue the Wage Grievance on Flatford's behalf:

> Dear Brother Flatford:
>
> Receipt is acknowledged of your unsigned letter postmarked February 19, 2013 concerning your request to appeal the October 25, 2012 decision rendered pursuant to Article 33, Section 2(b).
>
> Your writing suggests a letter was sent to this office dated November 30, 2012 requesting an appeal to the Public Review Board (PRB). A search of our files and records did not disclose a letter from you or any other member of your local union requesting an appeal to the PRB. The typed letter you reference has the date of November 30, 2012 handwritten near the bottom of the page. It is for this reason we cannot credit your assertion that the letter was sent to this office at that time.
>
> *The February 28, 2013 letter from the PRB captures the position we must constitutionally embrace.* As a result, we are closing the file.

(*See* the "Stokes-Wilson Letter," ECF #21-21 (emphasis added).)

17

The Stokes-Wilson Letter is no help to Plaintiffs.  It is merely a restatement of King's and Klein's prior decisions not to pursue the Wage Claim.  Under similar circumstances, the United States Court of Appeals for the Sixth Circuit has held that a union's restatement of its previous denial of a member's grievance does not re-set the accrual date for a hybrid section 301 claim.  In *Fox*, *supra*, Minnie Fox ("Fox") filed a grievance with her union regarding her allegedly-wrongful termination.  *See Fox,* 914 F.2d at 798.  The company refused to rehire Fox and, in September 1987, a union shop steward informed Fox that the union did not intend to take any further action on her behalf.  *See id.*  Nonetheless, Fox continued her attempts to appeal the grievance within the union.  *See id.* at 803.  On March 18, 1988, the union wrote a letter to Fox reiterating that the shop steward had informed her that her grievance had been denied and that "there is nothing more the [u]nion can do for you."  *Id*.  Fox claimed that the union's letter entitled her to file suit within six months of March 18, 1988.  *See id.* at 804.  The Sixth Circuit disagreed:

> [Fox] discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation supporting her hybrid section 301 claim in September of 1987 when [the] shop steward … informed her that she would not be reinstated.  In fact, the March 18, 1988, letter specifically indicates that [the shop steward] fully explained the situation to Fox long before the letter was sent.  *We reject the plaintiff's argument that her perseverance despite the lack of available relief and the Union's resulting formal restatement of its position in the certified letter reset the accrual date for her hybrid section 301 claim.*

18

*Id. See also Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849, 852 (7th Cir. 1985) (Union's courtesy responses to plaintiff's repetitive grievance appeals are not "sufficient to toll the statute of limitations. Otherwise, a plaintiff could indefinitely delay resolution of labor disputes merely by bombarding his union with tiresome requests for needless review.").  As in *Fox*, Stokes-Wilson's response to Flatford's attempts to continue appealing the Union's final decision did not re-set the accrual date for Plaintiffs' Wage Claim.  Accordingly, that claim is time-barred.

## 2.  The Union is Entitled to Summary Judgment as to Plaintiffs' State Law Claims Because They are Completely Preempted by Federal Law

The Union argues that it is entitled to summary judgment on Plaintiffs' statutory fraud and common-law claims because they are completely preempted by Section 301.  When "an area of state law has been completely preempted, any claim purportedly based on the preempted state law is considered a federal claim from its inception." *Adkins v. General Motors Corp.*, 946 F.2d 1201, 1207 (6th Cir. 1991) (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987)).  The complete preemption doctrine "is applied primarily in cases raising claims preempted by LMRA § 301." *Adkins*, 946 F.2d at 1207 (internal citation omitted).  "The preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization." *Id.* (citing *Caterpillar*, 482 U.S. at 394).  "Section 301 preemption

governs claims either founded directly on rights created by collective-bargaining agreements or 'substantially dependent on analysis of a collective-bargaining agreement.'" *Id.* (quoting *Caterpillar*, 482 U.S. at 394).

In their state law fraud claims, Plaintiffs allege that the Union falsely represented that the to-be-completed MOU would provide them with hiring preferences and wage guarantees. (Am. Compl. at ¶39.) The Union contends that Section 301 completely preempts these claims because determining whether the Union's alleged representations concerning the terms of the forthcoming MOU were false is substantially dependent on an analysis of the MOU and/or other collective bargaining agreements.[4] (*See* the Union Mot. at 12, Pg. ID 297.) Simply put, the Union argues that the only way to determine whether its representations about the content of the MOU were false is by reading and

---

[4] The Union contends that the MOU should be treated as a collective bargaining agreement for purposes of Section 301 complete preemption. (*See, e.g.*, the Union Mot. at 12, Pg. ID 297.) Plaintiffs do not dispute that argument. Moreover, treating the MOU as a collective bargaining agreement and/or a "contract between an employer and a labor organization" for purposes of Section 301 complete preemption appears to be supported by precedent. *See, e.g.*, *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 228-29 (3d Cir. 1999) (finding an agreement between a union and employer that was entered into to "resolve[] a controversy arising out of the employment relationship" constituted a collective bargaining agreement for purposes of Section 301). *See also Laber v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Svc. Workers Int'l Union*, No. 13-640, 2014 WL 356357, at *6 (N.D. Ohio Jan. 31, 2014) (finding agreement to be a "contract between an employer and a labor organization" and, therefore, subject to Section 301 complete preemption where, among other things, "[t]he agreement was the result of negotiations that addressed an important issue arising out of the employment relationship, namely, a one-time voluntary separation plan").

20

interpreting the MOU.   In the alternative, the Union contends that Section 301 completely preempts Plaintiffs state law claims because the rights the Plaintiffs are claiming (e.g., the Hiring Preference and Wage Guarantee) were created by a collective bargaining agreement, not by state law.   The Court agrees that Plaintiffs' state law claims are completely preempted.

Plaintiffs' state law claims are much like those the Sixth Circuit held to be completely preempted in *Adkins, supra*.   In that case, the plaintiff union members alleged that their union, in collusion with their employer, misrepresented to them that a revised collective bargaining agreement would preserve certain rights to which they had been entitled under a prior "bridge agreement."   *See Adkins*, 946 F.2d at 1204.   Following ratification of the revised collective bargaining agreement, the union members brought a state-law fraud claim against the union. The Sixth Circuit held that Section 301 completely preempted the claim:

> The plaintiffs' claim … was that the president of Local 801 had fraudulently induced them to ratify the 1979 collective-bargaining agreement that abrogated the "bridge agreement"….  In order to adjudicate this claim, the court below would have been obliged, at a minimum, to determine that the "bridge agreement" conferred such rights on the plaintiffs, that the subsequent collective-bargaining agreement abrogated those rights, and that they plaintiffs agreed to the 1979 collective-bargaining agreement because the president of Local 801 misrepresented those rights as the court construed them. As the court below correctly concluded, such a judicial undertaking would necessarily involve the federal courts in adjudicating a claim "substantially dependent on

> analysis of collective-bargaining agreements." We might go even farther and say that the rights at issue are "created by collective-bargaining agreements," thus effecting a complete preemption of plaintiffs' fraud claims.

*Id.* (internal citations omitted).

As in *Adkins*, the adjudication of Plaintiffs' state law fraud claims would necessarily involve interpretation of a collective-bargaining agreement. Indeed, as noted above, whether the alleged misrepresentations were false depends upon the content of the MOU. Moreover, the rights at issue (e.g., the Hiring Preference and the Wage Guarantee) are created by collective-bargaining agreements, not by state law. *Adkins* compels the conclusion that Plaintiffs' state law causes of action are completely preempted by section 301.

Plaintiffs counter by citing several cases in which the United States Supreme Court or the Sixth Circuit has held that a claim of fraudulent inducement is not preempted by section 301 of the LMRA. *See Caterpillar, supra*; *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. UAW*, 523 U.S. 653 (1998); and *Alongi v. Ford Motor Co.*, 386 F.3d 716 (6th Cir. 2004). But these cases are distinguishable because, in each case, the misrepresentation alleged by the plaintiffs dealt with matters *extraneous* to the parties' collective-bargaining agreements. In other words, the alleged misrepresentations did not pertain to the terms of the collective bargaining agreements themselves; instead, the

22

representations addressed matters not expressly addressed in the agreements.  *See Caterpillar*, 482 U.S. at 388 (individual promises of indefinite employment); *Textron*, 523 U.S. at 654-55 (representations that company had no plans to subcontract any work); *Alongi*, 386 F.3d at 726 (individual promises that employer would remain open for six years that that plaintiffs' jobs were secure).  Those cases – unlike the instant action – did not require the courts to interpret the provisions of a collective bargaining agreement, "but only to determine whether [the union or company] made the statements alleged, and whether plaintiffs reasonably relied on them."  *Alongi*, 386 F.3d at 726.  In contrast, the Union's alleged promises at the January 2007 Meeting related specifically to terms to be included in the MOU.  It is impossible to determine the accuracy of the Union's alleged representations without reading the MOU to determine whether the promised terms were, in fact, included in the final agreement.  This case is therefore much closer to *Adkins* than *Caterpillar*, *Textron*, or *Alongi*.

Accordingly, Section 301 completely preempts Plaintiffs' state law claims. The Court therefore deems Plaintiffs' state law claims to state a federal cause of action pursuant to Section 301 and/or Section 9(a).  *See, e.g. Loftis v. United Parcel Svc., Inc.*, 342 F.3d 509, 515 (6th Cir. 2003) (where state law cause of action is completely preempted by federal law, "[t]he complaint itself is therefore deemed to state a federal cause of action").  *See also Ritchie v. Williams*, 395 F.3d

23

283, 289 (6th Cir. 2005) (state law claims that are completely preempted by federal law are "recharacteriz[ed]" as federal claims). These claims are barred by the six-month statute of limitations for the reasons explained in Part 1 of this Opinion and Order.

* * * * *

One final note on Plaintiffs' state law fraud claims. Even if the claims were not completely preempted, they would still fail as a matter of law. Plaintiffs have not identified any fraudulent misrepresentation by the Union. Plaintiffs' sole allegation of fraud is that the Union falsely stated at the January 2007 Meeting that the MOU would provide hiring preferences and wage guarantees. (*See* Am. Compl. at ¶9.) But Plaintiffs expressly allege that *the MOU did contain the promised hiring protections and wage guarantees*. (*See id.* at ¶11 (the Union's "commitment to employees … [concerning the hiring protections and wage guarantee that was] made verbally at the January 31, 2007 meeting … was also contained in" the MOU).) The Union's representations concerning the contents of the forthcoming MOU were thus accurate, *not* fraudulent, and Plaintiffs' fraud claims are without merit. Finally, while Plaintiffs label their state law claims as ones asserting "fraud," Plaintiffs' own allegations make clear that the conduct underlying these claims is the alleged "breach[] by GM and UAW" of the contractual promises made to Plaintiffs. (*Id.* at ¶14.) Indeed, Plaintiffs complain

24

that they were denied their "contractually-mandated" rights. (*Id.*)   But under Indiana law, a fraud claim does not lie where, as Plaintiffs allege here, "[t]he misrepresentation did not result in injury distinct from that resulting from the breach" of contract.   *Epperly v. Johnson*, 734 N.E.2d 1066, 1073 (Ind. App. 2000).

## <u>CONCLUSION</u>

For all of the reasons explained above, **IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment (ECF ##21-22) are **GRANTED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 1, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 1, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

25